

FILED

2024 Sep-25  PM 02:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **TOMBIGBEE ELECTRIC COOPERATIVE, INC.,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) | **7:22-cv-01204-LSC** |
| **SHELTON ENERGY SOLUTIONS, LLC,** | ) ) ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF OPINION

Before the Court are Plaintiff Tombigbee Electric Cooperative's Motion for Summary Judgment (Doc. 93) and Defendant Shelton Energy Solution, LLC's Motion for Partial Summary Judgment (Doc. 91). For the reasons stated below, Plaintiff's Motion for Summary Judgment is due to be **DENIED** and Defendant's Motion for Partial Summary Judgment is due to be **DENIED**. Also before the Court are Plaintiff's Motion to Strike (Doc. 97) and Defendant's Motions to Strike (Docs. 96, 120.) For the reasons stated below, Plaintiff's Motion to Strike is due to be **DENIED**, Defendant's first Motion to Strike (Doc. 96) is due to be **DENIED** in part and **GRANTED** in part, and Defendant's second Motion to Strike (Doc. 120) is due to be **DENIED**.

# I. BACKGROUND[1]

Citizens of Vernon, Alabama incorporated Tombigbee Electric Cooperative ("TB-Elec") in 1941 to provide power to members in Marion, Fayette, and Lamar counties. (Doc. 93 ¶ 3.) TB-Elec now provides electricity to approximately 10,000 Alabama residents. (*Id.*) TB-Elec's wholly-owned subsidiary, Tombigbee Communications, LLC ("TB-Comm")[2] provides "fiber-to-the-home broadband internet services" to around 15,000 residents of Marion, Fayette, Lamar, Franklin, Winston, and Walker counties. (Doc. 53 ¶ 15.) TB-Elec and TB-Comm both operate out of the same office in Hamilton, Alabama, and have the same CEO, CFO, and "other executives." (Doc. 93 ¶ 15.) Additionally, "Tombigbee's Board of Trustees makes decisions for both TB-Elec and TB-Comm." (*Id.*)

TB-Elec owns the power poles and electrical lines it uses to supply electricity to its customers, as well as the "fiber cables or lines" TB-Comm uses to provide internet services. (*Id.* ¶ 5.) TB-Comm leases these fiber cables from TB-Elec. (*Id.*) TB-Elec has entered into contracts called "joint use agreements" or "pole attachment agreements" with other entities such as AT&T, Centurylink, Charter

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record…").
[2] SES refers to TB-Comm as "Freedom Fiber" in its briefs and some of the filed exhibits.

Communications, and Bevill State Community College to allow them to make "attachments" to TB-Elec's poles. (*Id*. ¶ 70.) Defendant's expert consultant defines "attachment" as "any non-power connection or appendage to a pole (e.g., cable or fiber, communication equipment)." (Doc. 91-35 ¶ 6.) Within this industry, the entities that own an "attachment" to another entity's power pole are referred to as "attachers." (Doc. 55 at 18.)

Defendant Shelton Energy Solutions, LLC ("SES") is a Louisiana limited liability company that provides "transmission, distribution, substation and renewable maintenance services." (*Id*. ¶¶ 2, 16.) During the time relevant to the issues in this matter, SES also conducted "Joint Use" work. (Doc. 93 ¶ 12.) Joint use work involves "permitting, structural analysis of poles, safety audits, attachment audits, pole attachment contract negotiations between telephone or cable companies and power companies, and street light audits." (*Id*. ¶ 14.) SES "hired several employees of Volt Power, LLC" ("Volt"), a company that also conducts joint use work. (*Id*. ¶ 21); (Doc. 108 ¶ 21). One such employee, Eric Deville, worked on an "attachment audit" for TB-Elec during his employment at Volt. (Doc. 93 ¶ 24.) An attachment audit is an audit of "each and every attachment to the poles regardless of who owns the attachments." (*Id.* ¶ 25.)

In January 2021, shortly after Mr. Deville began working for SES, TB-Elec and SES began discussing the possibility of SES performing a safety audit for TB-Elec.

(*Id.* ¶ 35.) Safety audits differ from attachment audits in that they involve only the inspection of third-party companies' attachments to poles to ensure that the third parties are in compliance with applicable regulations. (*Id.* ¶ 25.) On January 13th, 2021, Mr. Deville sent an email to TB-Elec containing a Professional Services Agreement ("2021 PSA"). (Doc. 53 ¶ 21.) In the email, Mr. Deville stated, "This PSA is for us to do the permitting and Safety audits. Remember this is a free service to Tombigbee Elect[r]ic." (Doc. 94-8.) The 2021 PSA had already been signed by SES, but TB-Elec never signed it. (Doc. 53 ¶ 21.) However, TB-Elec "allowed SES to proceed with the proposed safety audit." (Doc. 106 at 31.)

SES terminated Mr. Deville's employment in September 2021. (Doc. 93 at 21.)  Gary Guin replaced Mr. Deville in SES' joint use division. (*Id.* ¶ 63.) In February 2022, Mr. Guin realized that the 2021 PSA had never been signed. (*Id.* ¶ 64.) Mr. Guin then contacted TB-Elec employee Mark Carden to discuss the execution of a revised PSA (doc. 94-9 at 49, 55-56), and the remaining work to be done on the safety audit. (Doc. 93 ¶ 65.) On March 10, 2022, Mr. Guin and fellow SES employees Jessica Fuqua and Callie Howard met with TB-Elec's then-CEO Steve Foshee, CFO Matilda Harrison, and Mark Carden at TB-Elec's headquarters to discuss the remaining work on the safety audit. (Doc. 55 ¶ 27.) That same day, Ms. Fuqua emailed Ms. Harrison asking for the contact information of TB-Elec's attachers and the contracts between TB-Elec and its attachers. (Doc. 93 ¶ 69.)  Ms.

Harrison replied with the contact information for AT&T, Alabama Power, Bevill State, CenturyLink, Charter Communications, and Frontier. (*Id.* ¶ 70.)

On April 4, 2022, Mr. Guin emailed a new Professional Services Agreement ("2022 PSA") to Mr. Carden and Ms. Harrison. (*Id.* ¶ 74.) Mr. Carden emailed the 2022 PSA, signed by TB-Elec, back to Mr. Guin on April 26, 2022. (*Id.* ¶ 82.) SES began sending "findings" from the safety audit on April 21, 2022. (Doc. 108 ¶ 86.) On July 14, 2022, SES sent an email to TB-Elec, TB-Comm, AT&T, Charter Communications, CenturyLink, and Bevill State containing invoices and data from the safety audit. (Doc. 95-13.)[3] The invoices included $814,381.10 in charges attributable to TB-Comm. (Doc. 55 at Counterclaim ¶ 22.)

The 2022 PSA provided that attachers would be invoiced based on their percentage of the "total violations" found in the safety audit, and that if the attachers did not pay their invoices within 90 days, TB-Elec would be required to make those payments. (Doc. 53-5 at 6.) To date, neither TB-Elec, TB-Comm, nor any of the listed attachers have paid their invoices to SES.

Before the 90-day period lapsed, TB-Elec filed claims for breach of contract, fraud, gross negligence, and willful misconduct against SES. (Doc. 53.) TB-Elec's Complaint also seeks declaratory judgments interpreting the terms of the 2022 PSA,

---

[3] SES sent an invoice for $184,462.91 in charges to CenturyLink, $10,589.40 to AT&T, $170,112.34 to Charter Communications, and $141.22 to Bevill State. (Doc. 55 ¶ 33-37.)

determining whether TB-Elec can be held liable for its failure to pay SES, and determining whether the 2022 PSA is void or voidable. (*Id.*) SES filed counterclaims for breach of contract. (Doc. 55.)

## II.   MOTIONS TO STRIKE

Before considering the parties' Motions for Summary Judgment, the Court must address three Motions to Strike.

### A. TB-Elec's Motion to Strike SES' Motion for Partial Summary Judgment

First, Plaintiff TB-Elec moves to strike Defendant SES' Motion for Partial Summary Judgment. (Doc. 97.) The parties initially filed their cross-motions for summary judgment on November 16, 2023. (Docs. 70, 71.) However, on December 5, 2023, the motions were denied in light of the parties' decision to pursue mediation. (Doc. 82.) The parties were "granted leave to reassert their motions as currently filed" if mediation efforts were unsuccessful. (Id.) After mediation efforts failed, SES refiled its Motion for Partial Summary Judgment on January 1, 2024. (Doc. 91-1.) TB-Elec subsequently moved to strike SES' refiled motion, arguing that it differs slightly from the original. (Doc. 97.) SES attached the contract between Volt and TB-Elec as an exhibit to the refiled motion (doc. 91-42), added a footnote (doc. 91-1 at 17 n.16), and underlined and bolded a phrase (id. at 17), but the refiled motion is otherwise identical to the original. (*See* doc. 70).

SES referenced the Volt contract in its original motion, but could not attach it as an exhibit because TB-Elec did not produce the Volt contract until the Court ordered it to do so on December 5, 2023. (Doc. 81.) The added footnote contains additional case citations to support SES' choice of law argument; otherwise, the footnote makes no substantive changes to the argument. Underlining and bolding a phrase also is not a substantive change to SES' argument. Because these changes are minimal and do not unduly prejudice TB-Elec, TB-Elec's Motion to Strike is **DENIED**.

## B. SES' Motion to Strike the Williams and Charter Affidavits

SES has moved to strike the Affidavit of James Williams and the Affidavit of Charter Communications (doc. 96), both of which are cited by TB-Elec in its Motion for Summary Judgment. (Doc. 93.) This second Motion to Strike is due to be GRANTED in part and DENIED in part. Because the Court does not rely on or refer to the Williams Affidavit in rendering its opinion on summary judgment, SES' Motion to Strike the Williams Affidavit is **DENIED** as moot.

SES moves to strike the Charter Affidavit on the grounds that TB-Elec did not produce the affidavit in response to SES' discovery requests. (Doc. 96-1 at 8.) "On or about February 23, 2023" (doc. 96-1 at 8), TB-Elec issued a subpoena to Charter Communications requesting "any and all documents arising out of or related to [SES'] audit(s) of [Charter's] attachments to [TB-Elec's] poles" and "any and all

communications between [Charter], [SES], and/or [TB-Elec] arising out of or related to [SES'] audits of [Charter's] attachments to [TB-Elec's] poles." (Doc. 96-4 at 5.) On July 28, 2023, Charter responded with an affidavit stating it was "unable to locate any documents, records, information, or correspondence in the possession or control of Charter that are responsive" to TB-Elec's subpoena. (Doc. 96-3.)

On February 22, 2023, SES requested TB-Elec "[p]roduce all Documents, Tangible Evidence, and Communications in [its] care, custody, or control related to Paragraph 34 of [TB-Elec's] First Amended Complaint." (Doc. 96-5 at 10.) Paragraph 34 alleges, among other things, that SES breached the 2022 PSA by failing to notify TB-Elec's attachers about the safety audit. (Id. at 10.) TB-Elec did not produce the Charter Affidavit as a discovery response (doc. 96-1 at 9), but cites the affidavit in its Motion for Summary Judgment as evidence that SES did not notify the attachers. (Doc. 93 ¶ 50.)

SES argues that under Federal Rule of Civil Procedure 37(c), TB-Elec may not use the Charter affidavit as evidence on its Motion for Summary Judgment because it failed to produce the affidavit as a supplement to its previous discovery responses. (Doc. 121 at 4.) TB-Elec argues that it complied with Rule 45's requirement that "before [a subpoena] is served on the person to whom it is directed, a notice and a copy of the subpoena must be served on each party." Fed. R. Civ. P. 45(a)(4). The Advisory Committee Notes to Rule 45 provide that "Parties desiring

access to information produced in response to the subpoena will need to follow up with the party serving it or the person served to obtain such access." Fed. R. Civ. P. 45. Therefore, TB-Elec claims it was not required to provide the Charter Affidavit absent a subsequent request from SES. (Doc. 112 at 7.)

In an abundance of caution, the Court **GRANTS** SES' Motion to Strike the Affidavit of Charter Communications. However, striking the Charter Affidavit does not affect the Court's ruling on the parties' cross-Motions for Summary Judgment. Even without considering the Charter Affidavit, the record evidence still creates a genuine issue of material fact as to whether SES notified the attachers of the safety audit.

### C. SES' Motion to Strike the Lightsey Declaration

The next motion before the Court is Defendant SES' Motion to Strike the Lightsey Declaration (doc. 94-1), which TB-Elec cites as evidentiary support in its Motion for Summary Judgment. (Doc. 93). SES argues that the Lightsey Declaration should be stricken because it is a "sham affidavit." (Doc. 120-1 pp. 3–6). Federal Rule of Civil Procedure 56(c)(4) provides that "[a]n[y] affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A sham affidavit is one submitted in "flat contradiction" to "prior, sworn testimony." *Duke v.*

*Nationstar Mort., LLC.*, 893 F. Supp. 2d 1238, 1244 (N.D. Ala. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)).

"[A] court may disregard an affidavit if it flatly contradicts, without any explanation, clear testimony that the party provided at an earlier deposition." *Cooper v. Georgia Dep't of Transportation*, 837 F. App'x 657, 665 (11th Cir. 2020) (citing *Van T. Judkins & Assoc., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th. Cir. 1984)). But "[t]his rule applies only to inherent, unexplained inconsistencies that create 'transparent shams,' not to discrepancies that merely create an issue of credibility or that go to the weight of the evidence." *Cooper*, 837 Fed. App'x. at 665.

Because this Court finds that the Lightsey Declaration is based on sufficient personal knowledge of the facts and contains no "inherent, unexplained inconsistencies," SES' Motion to Strike the Lightsey Declaration is due to be denied. Britton Lightsey became the Chief Executive Officer of TB-Elec and TB-Comm on June 27, 2022 (*see* doc. 120-2 ¶ 2), shortly before SES sent the final invoices from the safety audit. (*See* doc. 95-13.) Lightsey testified in his deposition that he was not involved in the safety audit until "after the fact," but the Lightsey Declaration does not contradict that testimony. (Doc. 120-3 at 11.) As Lightsey explains in his declaration, he is "one of the custodians of the books and records that are [attached to his declaration] . . . [and he is] familiar with the contents of those books and records." (Doc. 120-2 ¶3.) Lightsey thus does not claim that he has personal

knowledge of the facts contained in the declaration based on his presence when the facts occurred, but based on his subsequent review of pertinent business records as TB-Elec's and TB-Comm's CEO. (Doc. 120-2 at 1-3.) Courts in this Circuit have consistently held that the "personal knowledge [required for a summary judgment affidavit or declaration] can be based on a review of relevant business files and records." See, e.g., *Phillips v. Mortg. Elec. Registration Sys., Inc.*, 2013 WL 1498956, at *4 (N.D. Ala. Apr. 5, 2013); *Duke*, 893 F. Supp. 2d at 1244.

The Lightsey Declaration also does not contradict Lightsey's representations at his deposition that he did not have any communications with SES and that he was not aware of any testimony he would be offering in the case. In the Declaration, Lightsey states that various communications occurred between SES and TB-Elec during the performance of the safety audit, but he does not state that he was involved in any of those communications. (Doc. 120-3 at 12.) The Lightsey Declaration avers that the statements therein are "based upon [his] own personal knowledge," not his presence when the described events occurred. As personal knowledge can come from a custodian's review of business records, there is no patent contradiction in the Lightsey Declaration regarding communications with SES.

Finally, the fact that Lightsey stated in an April 2023 deposition that "to [his] knowledge," he was not aware that he would be providing any testimony in this case does not render an affidavit signed seven months later a "sham affidavit." (Doc. 120-

3 at 12.) If such a statement amounts to an inconsistency, it is certainly not an "unexplainable" one. When Lightsey was deposed in April 2023, less than a year after becoming the CEO of TB-Elec and TB-Comm, Lightsey may not have had the opportunity to review enough relevant business records to have acquired any personal knowledge relevant to this litigation. Even if he had, TB-Elec's attorneys may not have yet determined what testimony would be necessary in this case. Thus, there are no "inherent, unexplained inconsistencies" between Lightsey's deposition testimony and the statements in the Lightsey Declaration that would render the Declaration a "sham affidavit." Because the Court finds nothing inappropriate or impermissible about the Lightsey Declaration, SES' second Motion to Strike is due to be **DENIED**.

## III.   SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor." *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). The Court does not weigh the evidence as fact-finder; rather, it must "determin[e] whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact

because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).[4]

When parties have filed cross-motions for summary judgment, "courts should be very careful in their analysis to ensure that the proper party receives the benefit of the summary judgment standard." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir. 2023). "Before granting summary judgment for a party, the court must consider the evidence in the light most favorable to the non-movant and . . . draw all inferences in the non-movant's favor." *Id.* at 959. "Only once this is done may a court determine if a party is entitled to judgment as a matter of law; should any material questions of fact remain that may cause a reasonable factfinder to rule in the non-movant's favor, summary judgment must be denied." *Id.*

## IV.   SUMMARY JUDGMENT ANALYSIS

To begin, this Court applies the choice of law rules of the forum state, Alabama, to determine what law should apply to TB-Elec's substantive claims. *Grupo Televisa, S.A. v. Telemundo Communications Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) ("A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state."). "To determine which law applies in contract disputes, Alabama courts 'first look to the contract to determine whether the parties have specified a particular

---

[4] Plaintiff's declaratory judgment claims are governed by this same standard of review. *See, e.g.*, *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984) ("Disposition of a summary judgment motion in a declaratory judgment action is governed by the same basic principles that generally rule the grant or denial of such a motion.").

sovereign's law to govern.'" *Clanton v. Inter.Net Glob., L.L.C.*, 435 F.3d 1319, 1323 (11th Cir. 2006) (quoting *Stovall v. Universal Const. Co., Inc.*, 893 So.2d 1090, 1102 (Ala.2004)). In the instant case, the 2022 PSA includes a choice of law clause, which states that "This Engagement shall be governed by, construed, interpreted and enforced in accordance with the laws of the State of Louisiana, without giving effect to the principles of conflict of laws thereof." (Doc. 53-5 ¶ 11.) Therefore, this Court will apply Louisiana substantive law to the parties' breach of contract claims.

The parties dispute whether Alabama or Louisiana law should govern TB-Elec's tort claims. SES argues that the PSA's choice of law clause encompasses tort claims, while TB-Elec argues that it applies only to contract claims. SES fixates on the final phrase of the clause—"without giving effect to the principles of conflict of laws thereof"—arguing that "[b]y including this phrase, the parties agreed that all claims, including tort claims, would be governed by Louisiana substantive law." (Doc. 108 at 28.) However, the phrase "This Engagement" is what is relevant in determining the clause's scope.[5]

---

[5] SES misreads Paragraph 11, discussing the phrase "without giving effect to the principles of conflict of laws thereof" as if it refers to the conflicts of law principles of the forum state—Alabama. However, reading Paragraph 11 as a whole, "the principles of conflict of laws thereof" refers back to the phrase "the laws of the State of Louisiana." Clearly, the question of whether the PSA's choice of law clause applies to the parties' tort claims has nothing to do with whether or not effect is given to the principles of conflict of laws of the State of Louisiana. Even if the clause did state that Louisiana law would apply without giving effect to the principles of conflict of laws of Alabama, the result would be the same. The only support SES cites for its position that the phrase "without giving effect to the principles of conflict of laws thereof" expands the scope of the choice of law provision to include non-contractual claims is an article from the Washington Law Review and a decision from the Western District of Virginia, neither of which bind this Court.

Various courts have held that choice of law clauses similar to the one in the 2022 PSA were too narrow to encompass tort claims. For example, the Eleventh Circuit considered the scope of a choice of law clause providing "This Release shall be governed and construed in accordance with the laws of the State of Delaware without giving effect to the choice of law provisions thereof." *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1298 (11th Cir. 2003). The court found that the clause applied to "only the release itself" because it merely stated that "This Release" would be governed by Delaware law. *Id.* at 1300. Because the clause did "not refer to related tort claims or to *any and all claims or disputes arising out of settlement or arising out of the relationship of the parties*," it did not apply to the plaintiff's tort claims. *Id.*; *see also Sunbelt Veterinary Supply, Inc. v. International Bus. Sys. U.S., Inc.*, 985 F.Supp. 1352, 1354-56 (M.D.Ala.1997) (finding that the language "This Agreement shall be governed by and construed under the laws of the State of California, without reference to principles of conflict of laws" was too narrow to warrant application of California law to the parties' tort claims). Notably, the Eleventh Circuit did not find the phrase "without giving effect to the choice of law provisions thereof" instructive—it did not even mention the phrase in its analysis. *See Green Leaf Nursery*, 341 F.3d at 1300-01. When the Eleventh Circuit has found that choice of law language was broad enough to encompass tort claims, it was because it included a "clause dictat[ing] that some things beyond the

[contract's] terms" were also governed by the chosen state law. *See Alabama Aircraft Indus., Inc. v. Boeing Co.*, 2022 WL 433457, at *9 (11th Cir. 2022) (finding that the language "The interpretation of this Agreement *and the rights and liabilities of the parties to this Agreement* shall be governed by the law of the state of Missouri, excluding its conflicts of laws principles" was broad enough to apply to tort claims) (emphasis added); *Cooper v. Meridian Yachts Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009) (finding that tort claims were covered by a choice of law clause providing that "This Agreement, *and all disputes arising out of or in connection with it*, shall be construed in accordance with and shall be governed by the Dutch law.") (emphasis added). Like the choice of law clause in *Green Leaf Nursery*, the clause in the 2022 PSA states only that "This Engagement shall be governed by, construed, interpreted and enforced in accordance with" Louisiana law, not that "This Engagement and *any other claims arising out of it*" shall be governed by Louisiana law.

The PSA's choice of law clause does differ slightly from the clauses discussed in the above-cited opinions in that it refers to an "Engagement" rather than an "Agreement" or "Release." Paragraph 1 of the PSA reads:

> Paragraph 1 of the 2022 PSA provides:
>
> **Engagement**. Client hereby retains Professional to provide those services (the "**Engagement**") described in the Client Proposal attached to this Agreement as **Exhibit A** (the "**Proposal**"). Professional accepts the retention and hereby agrees to perform the services described in the Proposal (the "**Services**") in accordance with applicable local, state and

federal laws and in accordance with any policies, standards and
procedures of Client that are provided in writing to Professional. Client
has executed this Agreement through its duly authorized agent, and
Client and agent both acknowledge the agent's authority.

(Doc. 53-5 ¶ 1.)

Based on this paragraph, the term "Engagement" seems to refer to "services" or the "Client['s] . . . ret[ention] [of the] Professional to provide . . . services." Substituting the first possible meaning of "engagement" results in a clause stating, "These services shall be governed by, construed, interpreted and enforced. . . ." This sentence simply does not make sense, because while an agreement regarding services can be construed, interpreted, enforced, and governed, services themselves are not construed, interpreted, enforced, or governed. If we instead utilize the second possible meaning, "the Client's retention of the Professional to provide services," the clause states that "the Client's retention of the Professional to provide services shall be governed by, construed, interpreted and enforced in accordance with the laws of the State of Louisiana, without giving effect to the principles of conflict of laws thereof." In the context of the words "construe," "interpret," and "enforce," the phrase "retention of the Professional to provide services" reads like "agreement with the Professional to provide services." This reading is supported both by the parties' own reading of the PSA and the definition of "engagement" in the legal context.

In its Reply in Support of its Motion for Summary Judgment, TB-Elec asserts that "This Engagement" refers to "the contract between TB-Elec and SES." (Doc. 122 at 3.) None of SES' filings explicitly state its definition of the term "engagement," but its arguments regarding the choice of law clause's scope indicate that it also understood "engagement" to refer to the contract or agreement between itself and TB-Elec. For instance, SES states in both its Motion for Summary Judgment and its Response to TB-Elec's Motion for Summary Judgment that "'Alabama law has long recognized the right of parties to *an agreement* to choose a particular state's laws to govern *an agreement*' unless contrary to Alabama public policy." (Doc. 91-1 23; doc 108 at 28 (quoting *Thakkar v. ProctorU, Inc.*, 642 F. Supp. 3d 1304, 1315-16 (N.D. Ala. 2022) (emphasis added)).[6] Furthermore, Black's Law Dictionary defines "engagement" as a "contract or agreement involving mutual promises . . . ." *Engagement*, BLACK'S LAW DICTIONARY (12th ed. 2024). Thus, the use of the word "engagement" instead of the word "agreement" or "contract" does not distinguish the PSA's choice of law clause from the choice of law clauses considered in the above-cited cases. "[T]herefore, the court must follow Alabama's choice-of-law rules" to determine what state's substantive law governs those claims. *Sunbelt*, 985 F. Supp. at 1354.

---

[6] SES' argument that the choice of law clause also governs tort claims arising out of the agreement is solely based on the clause's inclusion of the words "without giving effect to the principles of conflict of laws thereof." However, as previously discussed, this argument fails for multiple reasons. *See supra* n. 5.

"Alabama applies the traditional doctrine[] of . . . *lex loci delicti* to tort claims." *Colonial Life & Acc. Ins. Co. v. Hartford Fire Ins. Co.*, 358 F.3d 1306, 1308 (11th Cir. 2004). Under this doctrine, the court must "determine the substantive rights of an injured party according to the law of the state where the injury occurred." *Id.* at 1308 (quoting *Fitts v. Minnesota Mining & Mfg. Co.*, 581 So.2d 819, 820 (Ala.1991)). "[I]t is not the site of the alleged tortious act that is relevant, but the site of the injury, or the site of the event that created the right to sue." *Glass v. S. Wrecker Sales*, 990 F. Supp. 1344, 1347 (M.D. Ala. 1998); *see also Ex parte U.S. Bank Nat'l Ass'n*, 148 So. 3d 1060, 1069 (Ala. 2014). Where a plaintiff's damages are primarily financial in nature, "the 'injury' for choice of law purposes occurs in the jurisdiction where those economic damages are felt." *Doug's Coin & Jewelry, Inc. v. Am.'s Value Channel, Inc.*, 2015 WL 3632228, at *8 (N.D. Ala. June 10, 2015) (citing *Fitts*, 581 So. 2d at 820).

TB-Elec's claims for negligence and willful misconduct are based on its allegations that Deville misrepresented the cost of the safety audit to TB-Elec and that SES failed to "meet with, notify, and involve TB-Elec's attachers in the safety audit." TB-Elec's alleged damages are "SES['] claim[] that TB-Elec owes over $1.2 million for the safety audit." (Doc. 53 ¶ 79.) In this instance, the site of "the event creating the right to sue" is Alabama. *See Ex parte U.S. Bank Nat. Ass'n*, 148 So. 3d at 1071. The Alabama Supreme Court has held that when a plaintiff sues their insurer

for bad-faith failure to defend the plaintiff in a previous lawsuit, the event creating the right to sue is the insurer's failure to defend. *See Lifestar Response of Alabama, Inc. v. Admiral Insurance Co.*, 17 So.3d 200, 213 (Ala.2009). In *Lifestar*, the court held that the site of the injury was the state where the judgment against the plaintiff in the antecedent lawsuit was entered, not the state where the plaintiff felt the economic harm of the judgment against it. *See Ex parte U.S. Bank Nat. Ass'n*, 148 So. 3d at 1072 (discussing *Lifestar*, 17 So.3d 200). Negligence and willful misconduct claims are similar to a bad faith failure to defend claim in that they involve allegations that the defendant failed to do something it had a duty to do, and the plaintiff was damaged as a result. Here, the invoice stating TB-Elec owes SES $1.2 million is akin to the judgment stating Lifestar owed the plaintiff in the antecedent lawsuit $5 million. Just as Lifestar claimed that the judgment was entered against it due to its insurer's failure to defend against the antecedent lawsuit, TB-Elec alleges that the invoice was sent due to SES' failure to notify the attachers and accurately present the cost of the audit to TB-Elec. It is undisputed that SES emailed the final invoice to TB-Elec's Chief Financial Officer, Matilda Harrison. (*See* doc. 95-13.) Therefore, receipt of the invoice—the event creating the right to sue—

occurred in Alabama, where TB-Elec's principal place of business is located.[7] Thus, Alabama law governs TB-Elec's negligence and willful misconduct claims.

TB-Elec's claims for fraud and fraudulent misrepresentation and deceit are both based on its allegations that Eric Deville made misrepresentations that induced TB-Elec to enter into a contract with SES.[8] TB-Elec's alleged damages are, again, the $1.2 million SES invoiced to TB-Elec for the safety audit and the lost profit damages SES claims TB-Elec owes for causing SES to close their joint use division. As previously discussed, TB-Elec has not yet paid the $1.2 million invoice, nor has it paid SES any lost profit damages, so TB-Elec has not yet suffered financial injury. Therefore, the site of the injuries is the state where TB-Elec received SES' invoice and where SES' claim for lost profits was filed—Alabama. Thus, Alabama law governs TB-Elec's fraud claims as well.

## A. TB-Elec's Contract Claims

---

[7] TB-Elec has not yet paid the $1.2 million invoice SES sent, so TB-Elec has not yet suffered economic harm in the form of payments to SES. However, even if the Court considered the site of the injury for choice of law purposes to be the site of economic harm, TB-Elec's principal place of business is in Hamilton, Alabama, so any eventual economic harm would be suffered in Alabama. Therefore, Alabama substantive law would still apply.

[8] TB-Elec's claim for fraud in its Amended Complaint also alleges that before TB-Elec signed the April 2022 PSA, "SES represented to TB-Elec that the majority of the work had already been performed by SES," which TB-Elec alleges it later learned was untrue. (Doc. 53 ¶ 56.) The Complaint also alleges that "SES changed material terms of the contract from the First Contract to the Second Contract, but never communicated to [TB-Elec] that it had changed material terms." (*Id.* ¶ 57.) These allegations are listed in the Narrative Statement of Undisputed Material Facts in TB-Elec's Motion for Summary Judgment, but TB-Elec does not refer to them in its argument that it is entitled to summary judgment on its fraud claims.

Count I of TB-Elec's Amended Complaint raises several breach of contract claims against SES. (Doc. 53 ¶ 39-51.)  Specifically, TB-Elec alleges that SES breached the 2022 PSA by auditing TB-Comm's attachments to TB-Elec's poles and billing for that audit (id. ¶ 45), failing to hold an attacher meeting and notify the attachers that it was performing audits (id. ¶ 40), and "failing to timely and properly invoice attachers [and TB-Elec itself] for the audit services." (Id. ¶ 41, 48.) TB-Elec also seeks to have this Court declare that (1) the term "attacher" as used in the PSA does not encompass TB-Elec or its subsidiary, TB-Comm, (2) SES' audit of TB-Comm was outside the scope of the 2022 PSA, and (3) SES' failure to satisfy its obligations under the 2022 PSA preclude it from seeking payment from TB-Elec or the attachers. (Doc. 53 ¶¶ 60(a), (b), & (c).) TB-Elec moves for summary judgment on all its contract claims and its related declaratory judgment claims. (Doc. 93.) SES moves for summary judgment against all TB-Elec's contract claims. (Doc. 91-1.)

## 1.  The Meaning of "Attacher"

First, two of TB-Elec's contract claims require a determination of the meaning of the term "Attacher" as used in the 2022 PSA:

(1) TB-Elec's claim for a declaratory judgment on (i) whether the term "Attacher" as used in the PSA encompasses TB-Elec and TB-Comm and (ii)

whether the scope of services agreed to in the PSA therefore included audits of TB-Elec's or TB-Comm's attachments. (Doc. 53 ¶ 60(a) & (b).)

(2) TB-Elec's claim that SES breached its contract with TB-Elec by auditing TB-Elec's and TB-Comm's attachments and billing TB-Elec for those audits. (Doc. 53 ¶ 45.)

TB-Elec asserts that it is entitled to summary judgment on all three claims because TB-Elec and TB-Comm are not "Attachers" under the contract, and therefore SES acted outside the scope of the PSA in auditing TB-Elec and TB-Comm and billing TB-Elec for said audits. (Doc. 93 at 46.) For its part, SES argues that it is entitled to summary judgment on all three claims because TB-Comm is an "Attacher" under the April 2022 PSA, and thus the audit of TB-Comm was within the scope of the contract.[9] (Doc. 91-1 at 38, 31.)

The April 2022 PSA does not define the term "Attacher." TB-Elec and SES agree that within the context of the April 2022 PSA, "Attacher" refers to "'third party' attachers." (Doc. 91-1 at 29.) However, the parties do not agree on the meaning of "third party" in the context of the PSA—specifically, whether TB-Comm is a third party attacher. SES argues that TB-Comm is a third party attacher because, "[a]s a matter of fact and law, [TB-Comm] is a third-party entity as to [TB-Elec]."

---

[9] SES refers to TB-Comm as "Freedom Fiber" in its filings.

(Doc. 91-1 at 30.) TB-Elec argues that TB-Comm is not an "Attacher" under the April 2022 PSA because (1) TB-Comm was not included in the list of attachers TB-Elec sent to SES during the performance of the contract (doc. 93 at 32-33), and (2) TB-Comm is not a third party attacher because it is TB-Elec's wholly-owned subsidiary, and thus cannot be considered a "third party" as to TB-Elec. (Doc. 93 at 37-38.)

In order to grant summary judgment for either party on their claims regarding SES' audit of TB-Comm, this Court would first need to determine whether TB-Comm is a third party attacher, and thus an "Attacher" under the April 2022 PSA. This is not a determination the Court can make at the summary judgment stage.

Under Louisiana law, "the interpretation of an *unambiguous* contract is an issue of law for the court" which may be decided on summary judgment. *Cenac v. Orkin, L.L.C.*, 941 F.3d 182, 190 (5th Cir. 2019) (quoting *Amoco Prod. Co. v. Tex. Meridian Res. Expl. Inc.*, 180 F.3d 664, 668 (5th Cir. 1999) (emphasis added). "The determination of whether a contract is clear or unambiguous is a question of law," *Sims v. Mulhearn Funeral Home, Inc.*, 956 So.2d 583, 590 (La. 2007), but if a court determines as a matter of law that a contract is ambiguous, a question of fact arises, *see Carter v. BRMAP*, 591 So. 2d 1184, 1188 (La. Ct. App. 1991).[10]

---

[10] TB-Elec erroneously argues that, after finding the contract ambiguous as a matter of law, this Court should resolve the ambiguity in favor of TB-Elec, because "in case of doubt that cannot be otherwise resolved, a clause in a

"A contract is ambiguous . . . 'when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction.'" *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007). In Louisiana, the established rules of construction require a court to first "look to the plain text of the contract to determine whether its meaning is clear and unambiguous." *Cenac*, 941 F.3d at 190. "The words of a contract 'are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.'" *Guidry*, 512 F.3d at 181 (quoting *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La.2003)). "If the text is clear and unambiguous, the court may not go beyond the text for further interpretation." *Cenac*, 941 F.3d at 190.

Here, the 2022 PSA is ambiguous as to the meaning of "Attacher," because even after applying Louisiana's established rules of construction, the "PSA is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning." *Guidry*, 512 F.3d at 181. The plain text of the PSA does not define the term "Attacher." Thus, the Court must determine if the word has acquired a technical

---

contract must be interpreted against the party who furnished its text." (Doc. 93 at 40) (citing La. Civ. Code art. 2056; *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 764 (La. 1994)). TB-Elec argues that "[t]o the extent the evidence concerning the intent of the parties and the industry usage of this term does not resolve this ambiguity, the ambiguity must be resolved against SES as the drafter of the agreement." (Doc. 93 at 40-41.) The case TB-Elec cites in support of this argument concerns an insurance contract, and the cited principle regarding resolution of ambiguity against the drafter is specific to insurance contracts. Furthermore, this court cannot resolve the ambiguity in this case at all at the summary judgment stage, because, as discussed *infra,* the evidence demonstrates a dispute of material fact pertaining to the party's intent.

meaning. The parties seem to agree that in the context of a safety audit, the word "attacher" has acquired the technical meaning of a "third-party attacher." (Doc. 93 at 35; Doc. 91-1 ¶ 35.) Regardless, there remains a genuine issue of material fact regarding the application of the technical meaning of the term "attacher."

SES' expert Nelson Bingel and TB-Elec's expert Daran Anderson agree that "the word 'attacher' is commonly and generally used to describe third party entities with attachments to a pole owner's pole." (Doc. 72-13 at 4; Doc. 66-16 at 21.) However, the experts disagree on whether TB-Comm is encompassed by that technical definition. Bingel opines that because TB-Comm "is a third-party entity, not the pole owner, owns the lease rights to the fiber, and pays rent to [TB-Elec] via lease agreement to attach communication wires and equipment to [TB-Elec] poles," TB-Comm is "an attacher." (Doc. 66-16 at 21.) Anderson, however, opines that "the owner of the pole would not be considered an 'attacher' to its own poles," and "it would be improper for [TB-Comm] to be considered an attacher in this situation." (Doc. 66-16 at 4.) Anderson explains that attachment audits and safety audits are different, and while "'attachment audits' are audits of each and every attachment to the poles regardless of who owns the attachments[,] [s]afety audits are commonly thought to be audits of a particular third-party attacher or attachers' lines to poles . . . ." (Doc. 66-16 at 4.)

The parties offer extensive additional extrinsic evidence to support their respective definitions of "Attacher." The parties dispute whether the fact that TB-Comm was listed as an attacher in the Volt Attachment Audit data entitled SES to consider TB-Comm an attacher for the purposes of the safety audit.[11] Additionally, TB-Elec and SES disagree on the significance of the fact that TB-Elec did not include TB-Comm in the list of attacher contact information it sent to SES after the March 10, 2022 meeting.[12] Finally, the parties provide competing evidence of TB-Comm's relationship to TB-Elec for the purposes of the safety audit.[13]

SES argues that Bingel's expert opinion combined with the other extrinsic evidence offered by SES proves that "Attacher" as used in the 2022 PSA

---

[11] SES notes that TB-Comm was identified as an attacher in the Volt Attachment Audit data that TB-Elec sent to SES. (Doc. 91-1 at 27.) SES argues that this supports its reading of "attacher" as used in the PSA to include TB-Comm. TB-Elec responds that it did not intend the Volt data to serve as a list of attachers to be audited by SES, and that TB-Elec "never authorized SES to use the Volt audit results as a basis for the SES safety audit." (Doc. 106 ¶ 10-11.) TB-Elec employee Mark Carden stated that his understanding was that the Volt data "would be where [SES] got the . . . lat[itude] and longitudes of each pole." (Doc. 73-5 at 47:10-18.) TB-Elec also argues that the Volt Contract involved an attachment audit, not a safety audit. TB-Elec notes that "the purpose of the safety audit performed by SES was identify [sic] third-party attachers' safety violations on TB-Elec's poles." (Doc. 93 at 36). TB-Elec claims that it "had no intention of auditing itself and did not contract for SES to audit TB-Elec power lines or the fiber cables leased to TB-Comm, as its lines and cables can be anywhere on its own poles per the NESC standards." (Id. ¶ 72).

[12] TB-Elec argues that this list indicates that TB-Comm was not an attacher. (*See, e.g.,* doc. 106 at 8.) SES argues that the fact that TB-Comm was not included on the list would not indicate to SES that TB-Comm was not an attacher. SES would not have expected TB-Comm's contact information to be listed because TB-Comm and TB-Elec have the same contact information, so SES did not need TB-Elec to provide it. SES also argues that at the March 10, 2022 meeting, before SES asked for a list of contact information, the parties "discussed the scope of work for [TB-Comm] attachments" to be performed as part of the safety audit. (Doc. 91-1 at 23 (citing doc. 95-2 at 52-54).)

[13] SES argues that TB-Comm is a "third-party entity as to TB-Elec" because "[i]t maintains its own corporate identity in all respects and owns the right (by lease) to attach fiber to TB-Elec's poles." (Doc. 91-1 at 30.) TB-Elec asserts that TB-Comm is not a third party, because "it is a wholly owned subsidiary of TB-Elec," "share[s] office space and executives" with TB-Elec, and "does not have a joint use agreement or pole attachment agreement with TB-Elec like TB-Elec's other attachers," but rather "has a lease agreement to lease the use of TB-Elec's fiber on TB-Elec's poles." (Doc. 93 at 35-37.)

encompasses TB-Comm as a matter of law. In doing so, SES asks the Court to make a choice between two reasonable findings of fact. A genuine issue of material fact exists—and summary judgment is thus improper—"if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018). A rational jury viewing the expert opinions and other evidence submitted by both parties could find that the term "Attacher" as used in the 2022 PSA either does or does not encompass TB-Comm. Accordingly, summary judgment on TB-Elec's breach of contract and declaratory judgment claims regarding the meaning of "Attacher" are due to be denied.

### 2. Notice to the Attachers

Next, TB-Elec claims that "SES' failure to hold a meeting with attachers at the beginning of the project, to notify attachers of the audit services, to give attachers an opportunity to participate in the audit services, and to uphold its obligations in the April 2022 PSA" constitute breaches of the PSA. (Doc. 93 at 41.) TB-Elec also seeks a declaratory judgment that these breaches "preclude SES from seeking payment from TB-Elec in this case." (Doc. 53 ¶ 60(c).)

SES' motion for summary judgment on this portion of TB-Elec's contract claim is due to be denied. When a party moves for summary judgment on an issue "on which the non-movant would bear the burden of proof at trial," the movant may

support its motion for summary judgment in one of two ways. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). It may either (1) "show [ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the non-moving party's case" or (2) provide "affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *Fitzpatrick*, 2 F.3d at 1116 (quoting *U.S. v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir.1991) (en banc)). In the present case, SES has chosen the second route and has purported to offer affirmative evidence that it did satisfy its obligation to hold an "Attacher Meeting."

To support its assertion that it held an "Attacher Meeting" as required by the 2022 PSA, SES offers the testimony of its former employee Eric Deville, in which he "testified that he held a meeting for attachers at the start of the attachment audit (preceding the Safety Audit), where only Charter chose to attend." (Doc. 91-1 at 26.) The attachment audit Mr. Deville refers to was performed by Volt, not by SES. (Doc 91-2 at 104-05.) Mr. Deville worked for Volt during the course of the attachment audit, but worked for SES when SES began performing the safety audit for TB-Elec. (Doc. 91-1 ¶ 3-5). However, the attachment audit and safety audit were two separate audits performed by two different companies pursuant to two separate contracts. Mr. Deville's statement is evidence only that Volt held an attacher meeting before performing the attachment audit. It is not evidence that SES held an attacher meeting

at any time before, during, or after the safety audit. Nothing in the record indicates that SES' obligation to hold an attacher meeting was satisfied by the occurrence of an attacher meeting held by a different company performing a different audit before TB-Elec and SES began working together.

SES also asserts that it notified the attachers of the safety audit through methods other than an attacher meeting. For instance, SES refers to deposition testimony in which Mr. Deville states that Charter Communications knew about the safety audit from a conversation Mr. Deville had with a Charter representative while visiting a pole Charter was leasing from TB-Elec. (Doc. 91-2 at 193-94.) However, Deville also testified that this conversation occurred between the attachment audit and the safety audit and that he was likely employed by Volt at the time. (Id. at 194-95.) SES has not alleged any facts nor cited any law to suggest that this off-hand conversation with one of TB-Elec's attachers before Mr. Deville was employed by SES could discharge its obligation to hold an attacher meeting.

SES also cites Mr. Deville's testimony that he sent letters informing each attacher that SES would be performing a safety audit and that the attachers could contact SES for more information. (Doc. 91-1 at 188-91.) However, TB-Elec points out that Mr. Deville testified that he did not "think a copy [of the mailed notice] exists," because he never saved any copies. (Doc. 94-7 at 446-47.) A reasonable jury viewing the record as a whole could find—based on the fact that there is no tangible

copy or record of the letters Deville claims he sent—that Deville's deposition testimony is untrue and in fact, no letters were sent. Thus, even if SES had alleged—which it has not—that mailed notices would have fulfilled its obligation to hold an attacher meeting, TB-Elec has presented sufficient evidence to put a material fact—whether SES mailed notices out to the attachers—in genuine dispute.

As explained above, SES has failed to present sufficient affirmative evidence to demonstrate that TB-Elec will not be able to prove its breach of contract claim regarding SES' failure to hold an attacher meeting. Accordingly, SES' motion for summary judgment on that portion of TB-Elec's contract claim is due to be denied.

TB-Elec's motion for summary judgment on its breach of contract and declaratory judgment claims regarding notice to the attachers is also due to be denied. To secure summary judgment, TB-Elec "must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *U.S. v. Four Parcels of Real Prop.*, 941 F.2d at 1438 (citing *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir.1991)). In Louisiana, "[t]he essential elements of a breach of contract claim are: (1) the obligor's undertaking an obligation to perform; (2) the obligor failed to perform the obligation (the breach); and (3) the failure to perform resulted in damages to the obligee." *Moore v. Vauthier*, 389 So.3d 872, 878 (La. Ct. App. 2024)

(citing La. Civ. Code Ann. art. 1994; *Denham Homes, L.L.C. v. Teche Fed. Bank*, 182 So.3d 108, 119 (La. Ct. App. 2015)).

The 2022 PSA establishes that SES had an obligation to hold an "Attacher Meeting," satisfying the first element. (Doc. 53-5 at 6.) Under Louisiana contract law, "failure to perform results from nonperformance, defective performance, or delay in performance." La. Civ. Code Ann. art. 1994. TB-Elec alleges that the second element of its contract claim is satisfied because SES did not hold an attacher meeting or otherwise provide notice to the attachers that SES would be performing a safety audit. (Doc. 93 at 36.) In support of this allegation, TB-Elec cites an affidavit signed by Brighton Lightsey, stating that "SES did not hold a kickoff meeting for attachers." (Doc. 72-1 ¶ 32.) As discussed *supra*, the only evidence SES has submitted to refute this allegation is irrelevant. (Doc. 91-1 at 26.) Thus, TB-Elec has sufficiently established that SES failed to perform its obligation to hold an attacher meeting.

TB-Elec also alleges that SES breached the April 2022 PSA by failing "to notify attachers of the audit services it would be performing, as it had represented it would." (Doc. 93 at 46.) TB-Elec and SES have presented evidence to support and refute this allegation, respectively. However, the 2022 PSA does not contain a separate notification requirement in addition to the requirement to hold an attacher meeting. It is unclear whether TB-Elec believes that SES had a contractual

obligation to notify the attachers of the safety audit through some other method. TB-Elec simply alleges that Mr. Deville sent an email to TB-Elec's then-CEO Steve Foshee in March 2021, stating "that SES would begin getting the necessary notifications out to TB-Elec's customers/attachers, letting them know about the attachment audit and the process and procedures." (Doc. 53 ¶ 43); *see also* (Doc. 93 at 38 ¶ 4). However, TB-Elec does not allege that this representation modified SES' obligations under the 2022 PSA to add an obligation to provide notice to the attachers instead of or in addition to holding an attacher meeting. Even if Mr. Deville's email had modified the 2022 PSA to require SES to notify the attachers outside an attacher meeting, there is a genuine dispute of material fact precluding a finding that SES did not send notices to the attachers. Thus, TB-Elec has failed to sufficiently establish (1) that SES had a contractual obligation to notify the attachers beyond its duty to hold an attacher meeting, and (2) that if SES did have such an obligation, it failed to fulfill it.

Furthermore, even if there were no dispute of material fact on the issue of alternative notification of the attachers, summary judgment would still be due to be denied because TB-Elec has failed to establish that SES' failure to meet with or notify the attachers caused TB-Elec's damages. *See Fla. Gas Transmission Co., LLC v. Texas Brine Co.*, LLC, 282 So.3d 256, 260 (La. Ct. App. 2019) ("Causation is an essential element of both contract and tort claims. Whether a defendant's actions

caused the plaintiff's damages is a question of fact . . .") (citing *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 193 So. 3d 1110, 1115 (La. 2015)). TB-Elec claims that SES' failure to hold an attacher meeting or otherwise notify the attachers of the audit caused the attachers not to pay their invoices, leaving TB-Elec arguably responsible for the entire bill. (Doc. 93 at 28, 45.) However, TB-Elec has not cited any evidence to support this allegation beyond an affidavit stating that "it is believed that [the attachers' refusal to pay] is due, in large part, to the fact that the attachers did not receive any notice of the audit or any opportunity to participate in it." (Doc. 93 at 28 (citing Doc. 72-1 ¶ 54)). Because "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment," TB-Elec has failed to sufficiently establish the causation element of its breach of contract claim. *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 2738 (1983)). Therefore, summary judgment in either party's favor on TB-Elec's contract claims based on notification of the attachers is due to be denied.

### 3.  Invoicing the Attachers

Finally, TB-Elec claims that SES breached the 2022 PSA by "failing to timely and properly invoice attachers." (Doc. 53 ¶ 41, 48.) TB-Elec does not clearly

articulate the basis for its allegation that the invoices were untimely. TB-Elec merely states that it "began receiving audit results and invoices from SES in late April 2022," and that SES' employee Miranda Elliot "sent one collective email to all of the entities that she deemed to be attachers for purposes of the safety audit – including TB-Elec and TB-Comm" on "July 14, 2022, nearly eighteen months after work began." (Doc. 93 at 43.) TB-Elec also alleges that SES' failure to invoice TB-Elec until after all work on the audit was complete was untimely, and "prevented SES' mistake from being discovered earlier." (*Id*. at 48.) However, nothing in the 2022 PSA states that SES was required to invoice TB-Elec or its attachers within a particular amount of time.

SES asserts that "[b]ecause the PSA does not specify a project completion date, SES was obligated to perform 'within a reasonable time.'" (Doc. 91-1 at 34) (quoting La. C.C. art. 1778). SES argues that the timing of its invoices was reasonable because "[t]he PSA contemplates invoicing at project completion." (Doc. 91-1 at 36.) The 2022 PSA obligated SES to "[i]nvoic[e] [a]ttacher[s] based on violation percentages." (Doc. 53-5 at 6.) According to SES, "[t]his obviously means each attacher will be billed for the percentage of its violations based on the total number of violations for all attachers," and "[t]hat is precisely what occurred." (Doc. 91-1 at 36.) TB-Elec has not pointed to anything to refute this reading of the 2022 PSA.

Additionally, the record evidence indicates that SES waited until the audit's completion to invoice TB-Elec because TB-Elec asked SES to do so. Initially, SES sent TB-Elec an invoice after each "package" in the audit was complete. However, after SES had sent several package-by-package invoices (docs. 99-12, 99-33, 99-34), TB-Elec's CFO sent an email asking SES to send "one invoice of the total that TB-Elec owes for the safety audit" rather than sending invoices as each package was completed. (Doc. 91-17.) As SES points out, SES could not bill TB-Elec for the total it owed for the safety audit until the safety audit was complete. (Doc. 91-1 at 36.) Again, TB-Elec has offered nothing to counter this.

If the 2022 PSA and TB-Elec's own requests required invoicing at project completion, the timing of the invoices sent to TB-Elec and its attachers is only unreasonable if the time it took SES to complete the project was unreasonable. SES asserts that eighteen months was a reasonable amount of time in which to "perform[] the Safety Audit of TB-Elec's 7,000+ electrical poles, with cures designed for the approximately 7,883 violations." (Doc. 91-1 at 35.) To support this assertion, SES notes that the attachment audit contract between Volt and TB-Elec provided for completion within one year. (Doc. 100-1 at 3 (filed under seal).) However, TB-Elec has provided deposition testimony from Gary Guin—Mr. Deville's successor at SES—in which Mr. Guin states that he had heard the TB-Elec safety audit being referred to as "filler work" at SES. (Doc. 94-9 at 59-61.) Mr. Guin testified that after

hearing this, he told SES' fieldwork supervisor, "I want you to send all of your guys up here, and let's get this work done and get done with [TB-Elec]." (*Id.* at 62.)

SES also claims that there was nothing "improper" about its invoicing, because it "invoiced the attachers per the Payment Terms in the [2022] PSA." (Doc. 91-1 at 37.) TB-Elec does not seem to dispute SES' compliance with the Payment Terms, but it argues that SES "trick[ed] TB-Elec into signing" the 2022 PSA and "le[ft] TB-Elec holding the bag for the entirety of the audit expenses" after Mr. Guin "realized that SES and Deville had made a mess of the safety audit." (Doc. 93 at 45.) On April 4, 2022, Mr. Guin sent TB-Elec an email stating "we are in the final stages of the field work for the safety audit" and "still have quite a bit to finish up on the design side." (Doc. 94-10 at 10.) Mr. Guin attached a new PSA—the 2022 PSA—to this email. (*Id.*) TB-Elec claims that "[s]ince SES' safety audit work had purportedly been going on for 14 months at this point, TB-Elec believed that the work was at an advanced stage and that SES had taken all steps necessary to apprise attachers of the audit and to bill and collect from them, to the extent applicable." (Doc. 93 at 42-43.) According to SES, it did not ask TB-Elec to sign the 2022 PSA to trick TB-Elec, but to obtain a signed contract for the project and to clarify the scope of the safety audit. (*See* doc. 117 at 3 ("[the] meeting between representatives of TB-Elec and representatives of SES in March 2022 at TB-Elec's office [was] for the express

purpose of clarifying the scope of the project, in large part because of Deville's departure and the lack of a contract."))

Based on the evidence submitted by both parties, there are genuine disputes of material fact regarding the timeliness and propriety of SES' invoicing procedure. A reasonable jury viewing the record as a whole could find that eighteen months was a reasonable time in which to complete a safety audit and that SES' invoicing procedure was not otherwise "improper." However, a reasonable jury could instead find that the timing of completion was unreasonable because SES' employees had treated the safety audit as "filler work" until Mr. Guin became involved. Accordingly, summary judgment on this portion of TB-Elec's contract claim is due to be denied as to both parties.

### 4. SES' Failure to Perform its Obligations in Good Faith

Mixed in with TB-Elec's argument regarding the timeliness and propriety of the invoices is an allegation that SES breached the "implied covenant of good faith and fair dealing" by "not perform[ing] its obligations in good faith and in a manner that would reasonably allow for SES to collect from TB-Elec's attachers." (Doc. 93 at 44.) However, this allegation cannot form the basis of TB-Elec's breach of contract claim for untimely and improper invoicing or any of its other breach of contract claims.

"Louisiana does not recognize a separate and distinct obligation of good faith, the breach of which would be equivalent to a breach of the contract between the parties." *Gulf Coast Bank & Tr. Co. v. Warren*, 125 So. 3d 1211, 1219 (La. Ct. App. 2013). "The performance of an obligation or contract can be characterized as being in good faith or bad faith, but the party alleging bad faith performance must first allege facts revealing the duty to perform an obligation." *Id*. at 1219. Therefore, not only is TB-Elec unable to use a claim for breach of the covenant of good faith as a stand-in for its breach of contract claim, it also cannot support a separate claim for breach of the covenant of good faith without "first alleg[ing] facts revealing the duty to perform an obligation." *Id*. Because TB-Elec has not pointed to any provision in the 2022 PSA establishing an obligation to send invoices in a particular amount of time or in a particular manner, it has not met its initial burden of proof regarding its claim for breach of contract. Accordingly, it has also failed to support its claim for breach of the implied covenant of good faith as it relates to SES' invoicing methods.

TB-Elec's arguments that SES breached the implied covenant of good faith are so entangled in its overarching breach of contract arguments that it is impossible to determine which alleged obligation TB-Elec claims was carried out in bad faith. (*See* Doc. 93 at 44-46.) In any case, TB-Elec has failed to make a sufficient showing of bad faith with regard to any of SES' other obligations as to warrant summary judgment.

The text of the 2022 PSA sufficiently establishes that SES owed an obligation to conduct a safety audit of TB-Elec's attachers and to hold an attacher meeting. (Doc. 53-5 at 6.) However, establishing the existence of an obligation is only the first step in proving a claim for breach of the implied covenant of good faith. A plaintiff claiming breach of the covenant of good faith must also establish that the obligation was breached. *See Johnson v. Am. Sec. Ins. Co.*, 650 F. Supp. 3d 483, 488 (E.D. La. 2023) ("[I]f there is no valid claim for breach of contract, then, logically, there can be no claim for bad faith breach of the contract."). TB-Elec has not shown that SES failed to fulfill its obligation to conduct a safety audit, and thus cannot show a breach of the covenant of good faith regarding SES' obligation to do so.

The record evidence supports TB-Elec's assertion that SES failed to fulfill its obligation to hold an attacher meeting, but under Louisiana law, "[a] mere failure to fulfill an obligation, without a showing of intent or ill will, does not constitute a breach of good faith." *Brill v. Catfish Shaks of Am., Inc.*, 727 F. Supp. 1035, 1041 (E.D. La. 1989). While TB-Elec has shown that SES failed to hold an attacher meeting, TB-Elec has not provided any evidence that this failure was intentional or accompanied by ill will.

In sum, TB-Elec has failed to satisfy the prerequisites of a claim for breach of the covenant of good faith with regard to the auditing or billing of its attachers. Additionally, TB-Elec has failed to provide any evidentiary support for a claim that

SES acted in bad faith in failing to hold an attacher meeting. Thus, summary judgment in favor of TB-Elec on its claim for breach of the implied covenant of good faith and fair dealing is due to be denied.

Accordingly, summary judgment in favor of TB-Elec on Count I and Count III ¶ 60(a)-(c) of TB-Elec's Complaint is due to be **DENIED**. Summary judgment in favor of SES on the same counts is also due to be **DENIED**.

## B. SES' Contract Claims

SES' Counterclaim raises five bad faith breach of contract claims against TB-Elec. Specifically, SES alleges that TB-Elec breached the 2022 PSA when it failed to pay SES for its audits of TB-Comm, CenturyLink, AT&T, Charter Communications, and Bevill State (Doc. 55.) TB-Elec moves for summary judgment against all counterclaims. (Doc. 93.) SES moves for partial summary judgment on its counterclaims. Specifically, SES seeks a judgment that TB-Elec breached the 2022 PSA, but SES argues that whether or not the alleged breaches were done in bad faith is a question for the jury.

First, summary judgment on Count I of SES' Counterclaim—regarding TB-Elec's failure to pay for the audit of TB-Comm—is improper because there is a genuine issue of material fact regarding the meaning of "Attacher" in the 2022 PSA. The meaning of "Attacher" is integral to this breach of contract counterclaim,

because if TB-Comm is not an attacher, TB-Elec has no obligation to pay for SES' audit of TB-Comm, and Count I fails as a matter of law. Alternatively, if TB-Comm is an attacher, TB-Elec breached its obligation to SES by refusing to pay for the audit of TB-Comm. The Court has determined that the meaning of "Attacher" as used in the 2022 PSA is a question for the factfinder.

Accordingly, summary judgment in favor of TB-Elec on Count I of SES' Counterclaim is due to be **DENIED**. Summary judgment in favor of SES on Count I of SES' Counterclaim is also due to be **DENIED**.

In defense against the remaining counts of SES' counterclaim, TB-Elec argues that SES' alleged breaches of the 2022 PSA excuse TB-Elec from paying the invoices its attachers refused to pay. Under Louisiana contract law, "not every breach excuses the other party from the contract." *LAD Servs. of Louisiana, L.L.C. v. Superior Derrick Servs.*, 167 So. 3d 746, 756 (La. Ct. App. 2014). "[W]here one party substantially breaches a contract, the other party to it has a defense and an excuse for nonperformance." *Commerce Ins. Agency, Inc. v. Hogue*, 618 So.2d 1048, 1052 (La. Ct. App. 1993). "A breach is substantial if it is an actual cause of the other party's 'failure to comply with its obligations.'" *Alonso v. Westcoast Corp.*, 920 F.3d 878, 884 (5th Cir. 2019) (quoting *LAD Servs. of Louisiana*, 167 So. 3d at 756).

The Court cannot find that, as a matter of law, any of SES' alleged breaches of the 2022 PSA excused TB-Elec's performance. As previously discussed, TB-Elec has only successfully shown that SES' failure to hold an attacher meeting satisfies the first two elements of a breach of contract claim. TB-Elec has not sufficiently established those elements with regard to any of SES' other alleged breaches of the 2022 PSA. Moreover, TB-Elec has not sufficiently established that SES' failure to hold an attacher meeting was the cause of the attachers' refusal to pay the invoices. Therefore, TB-Elec has not met its burden of showing that SES' failure to hold an attacher meeting is a substantial breach that excuses TB-Elec's nonperformance. SES, however, has not established that its failure to hold the attacher meeting was *not* the cause of the attachers' refusal to pay. The evidence is such that a reasonable jury could find for either party on the issue.

Thus, the question of whether SES committed a substantial breach that relieved TB-Elec of its obligation to pay is one for the jury. Accordingly, partial summary judgment in SES' favor on Counts II, III, IV, and V of SES' Counterclaim is due to be **DENIED.**

TB-Elec seeks summary judgment on the entirety of SES' contract counterclaims, including SES' claims that TB-Elec acted in bad faith and SES' claim

for lost profit damages.[14] (Doc. 93.) TB-Elec argues it is entitled to summary judgment in its favor because SES has failed to prove that TB-Elec acted in bad faith. (Doc. 93 at 48-49.) However, under Louisiana law, "[j]udicial inquiry . . . into an obligor's (or even in some cases an obligee's) good-faith performance of the obligation is not triggered . . . unless and until we find that the party has failed to perform an obligation, from which the obligee has sustained damages." *Favrot v. Favrot*, 68 So. 3d 1099, 1109 (La. Ct. App. 2011).

Because the question of whether TB-Elec breached the 2022 PSA is one for the jury, this Court has not yet found that TB-Elec "has failed to perform an obligation." Therefore, under Louisiana law, a determination of whether TB-Elec's alleged breach was in good faith or bad faith is not appropriate at this point in the litigation.[15] A determination of whether SES may recover lost profits as damages for a bad faith breach of contract is also not appropriate until the jury determines whether a bad faith breach has in fact occurred.

Accordingly, TB-Elec's motion for summary judgment on Counts II, III, IV, and V of SES' Counterclaim is also due to be **DENIED**.

---

[14] SES alleges that it "was forced to shut down its joint use division and lay off multiple employees" due to TB-Elec's failure to pay. (Doc. 55 ¶ 41.) Therefore, in addition to its other alleged damages, SES seeks to recoup its lost profits from the closure of its joint use division. (*Id.* ¶¶ 48, 58, 68, 78, 88.)

[15] Even if SES had established that TB-Elec's failure to pay amounted to a breach of a contractual obligation, there remains a genuine question of material fact as to whether that failure was performed with "ill will." *Williams v. Coe*, 417 So. 2d 426, 430 (La. Ct. App. 1982) ("[B]ad faith is not [] the mere breach of faith in not complying with a contract, but a designed breach of it from some motive of interest or ill will.").

### C. Fraud & Fraudulent Misrepresentation

TB-Elec and SES each seek summary judgment in their respective favor on TB-Elec's fraud and "fraudulent misrepresentation and deceit" claims and its associated declaratory judgment claim. TB-Elec's fraud claims are based on the same set of facts, and the elements of both are the same under Alabama law.

In Alabama, "[t]he elements of fraudulent misrepresentation [and fraud] are: '(1) [a] false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation.'" *Alabama Psychiatric Servs., P.C. v. 412 S. Ct. St., LLC*, 81 So. 3d 1239, 1247 (Ala. 2011) (quoting *Coastal Concrete Co. v. Patterson*, 503 So.2d 824, 826 (Ala.1987) (reciting the above elements as the elements of fraud)). However, in claims for fraud or fraudulent misrepresentation based on "promises or opinions," *Clanton v. Bains Oil Co.*, 417 So. 2d 149, 151 (Ala. 1982), "two additional elements must be proved: (1) the defendant's intention, at the time of the alleged misrepresentation, not to do the act promised, coupled with (2) an intent to deceive." *Coastal Concrete*, 503 So. 2d at 826 (citing *Clanton*, 417 So. 2d at 151).

TB-Elec alleges that while acting as SES' representative, Eric Deville falsely represented that the safety audit would be "a free service" to TB-Elec, when SES now claims that TB-Elec owes over $1.2 million in payments for the safety audit.

(Doc. 93 at 54.) TB-Elec alleges that this statement was false, because the safety audit was not free to TB-Elec, and that the cost of the safety audit was a material fact that it relied upon in deciding to contract with SES. (*Id.* at 55-56.) TB-Elec also alleges that it was damaged by this misrepresentation, because SES now seeks $1.2 million from TB-Elec as payment for the safety audit. (*Id.* at 56.) Mr. Deville's statement about the cost of services is essentially a promise, so TB-Elec must prove the two additional intent elements to succeed on its fraud claims. Even assuming all four elements for basic fraud are met, there is still a genuine question of material fact regarding the additional intent elements.

Mr. Deville testified during his deposition that his email stating "this is a free service to Tombigbee Elect[r]ic," was referring to the permitting services included in the PSA, not the safety audit. According to Mr. Deville, he sent the email from TB-Elec's office after discussing with TB-Elec's employee Mark Carden that permitting services were free to TB-Elec, but "the safety audit side is a whole different ball game." (Doc. 72-6 at 131.) Mr. Deville stated that Mr. Carden asked him to "put that in an email," and Mr. Deville "just didn't word it correctly." (*Id.*)

There is sufficient evidence in the record for a jury to find that Mr. Deville did not "intend . . . not to do the act promised," because what he believed he had promised was that the permitting was free, not the safety audit. There is also sufficient evidence to support a finding that Mr. Deville did not "inten[d] to deceive"

TB-Elec, but simply worded the email poorly. However, a reasonable jury considering the text of the email and the evidence of Mr. Deville's alleged "reputation for deceitfulness" could also find that Mr. Deville did have the requisite intent to deceive and not do the act promised. (Doc. 93 at 55.) Therefore, the Court cannot determine as a matter of law whether Mr. Deville's statement regarding the cost of services satisfies the intent elements of fraud or fraudulent misrepresentation based on a promise. This issue is for the trier of fact to decide.

TB-Elec also alleges that Mr. Deville falsely represented that "SES would begin getting the necessary notifications out to TB-Elec's customers/attachers," when no notifications were ever actually sent to the attachers. (Doc. 93 at 54.) There is a genuine question of material fact as to the falsity of this statement that precludes summary judgment. As previously discussed, there is sufficient evidence for a reasonable jury to conclude that the referenced notifications to TB-Elec's attachers did occur or did not occur. Therefore, the Court cannot determine as a matter of law whether Mr. Deville's statement that notifications would be sent out satisfies the first element of fraud or fraudulent misrepresentation.[16] Accordingly, the Court also

---

[16] SES addresses TB-Elec's fraud claims as if they were raised as affirmative defenses to contract formation rather than as separate causes of action. For example, SES raises arguments related to consent (doc. 91-1 at 42), parol evidence (*id*. at 44), and the presumption that a signatory to a contract knows its terms. (*Id*. at 49). However, the instant question is not one of contractual interpretation or enforcement. The only question the Court must ask in determining whether SES is entitled to summary judgment is whether SES has demonstrated that there are no genuine questions of material fact and TB-Elec cannot establish the elements of its fraud claims as a matter of law. Because the Court has determined that TB-Elec's fraud claims involve questions of material fact to be resolved by the jury, SES has not met its burden and thus is not entitled to summary judgment.

cannot enter a judgment declaring whether Mr. Deville's allegedly fraudulent statements render the 2022 PSA "void, voidable, or unenforceable." (Doc. 53 ¶ 60(d).)

Accordingly, summary judgment in favor of TB-Elec on Counts II, IV, and Count III ¶ 60(d) of its Complaint is due to be **DENIED**. Summary judgment in favor of SES on the same counts is also due to be **DENIED**.[17]

## D. Negligence & Willful Misconduct

Finally, in Counts V and VI of its amended complaint, TB-Elec asserts claims of gross negligence and willful misconduct against SES. TB-Elec also seeks a declaratory judgment ruling on "[w]hether SES' gross negligence and/or willful misconduct provide an exception to any liability on the part of [TB-Elec] pursuant to" the 2022 PSA's indemnity provision. (Doc. 53 ¶ 60(e).)

---

[17] This Court would reach the same conclusion even if it agreed with SES that Louisiana law applied to TB-Elec's tort claims. In Louisiana, the elements of fraud are "(1) a misrepresentation of material fact, (2) made with the intent to deceive, (3) causing justifiable reliance with resultant injury." *Chapital v. Harry Kelleher & Co., Inc.*, 144 So. 3d 75, 86 (La. Ct. App 2014) (quoting *Becnel v. Grodner*, 982 So.2d 891, 894 (La. Ct. App. 2008). Even if the Court applied the Louisiana elements of fraud, there are still genuine questions of material fact that preclude the entry of summary judgment in favor of either party. As discussed in the analysis under Alabama law, there is a question of material fact as to whether Mr. Deville's statement that SES would notify the attachers was a misrepresentation, because there is sufficient evidence to support a conclusion that the notifications did occur or that they did not occur. Additionally, there is sufficient evidence from which a reasonable jury could find that Mr. Deville did not possess the requisite intent to deceive when he stated "this is a free service to Tombigbee." Accordingly, summary judgment would be due to be denied on Counts II and IV even if the 2022 PSA's choice of law clause applied to tort claims.

Under Alabama law, gross negligence and willful misconduct are two separate theories of liability. "To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Lemley v. Wilson*, 178 So. 3d 834, 841 (Ala. 2015) (quoting *Martin v. Arnold*, 643 So.2d 564, 567 (Ala.1994)). In Alabama, "'[g]ross negligence' is negligence, not wantonness." *Miller v. Bailey*, 60 So. 3d 857, 866 (Ala. 2010) (quoting *Smith v. Roland*, 243 Ala. 400, 403, 10 So.2d 367, 369 (1942)) (internal quotation marks omitted). The most an Alabama court has differentiated between negligence and gross negligence is by suggesting that gross negligence is "merely a greater degree of negligence." *Coca-Cola Bottling Co. United v. Stripling*, 622 So. 2d 882, 885 (quoting *Lynn Strickland Sales & Serv., Inc. v. Aero-Lane Fabricators, Inc.*, 510 So. 2d 142 (Ala. 1987) (overruled on other grounds by *Alfa Mut. Ins. Co. v. Roush*, 723 So. 2d 1250 (Ala. 1998)) (internal quotation marks omitted). However, courts have more frequently held that gross negligence is no different from plain negligence. *See, e.g.*, *Fid.-Phenix Fire Ins. Co. v. Lawler*, 81 So. 2d 908, 912 (Ala. Ct. App. 1955); *Ridgely Operating Co. v. White*, 150 So. 693, 695 (1933) ("Ordinarily the word 'gross,' when applied to negligence, imports nothing more than simple negligence").

Whereas negligence does not require a showing that the defendant acted with a certain knowledge or intent, "wanton or willful misconduct is characterized as such

by the state of mind with which the act or omission is done or omitted." Phillips ex rel. *Phillips v. United Servs. Auto. Ass'n*, 988 So. 2d 464, 468 (Ala. 2008) (quoting *Ex parte McNeil*, 63 So. 992, 993 (1913)). Specifically, "[i]mplicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury." *Lynn Strickland Sales & Serv.,* 510 So. 2d at 145.

Here, TB-Elec has failed to sufficiently establish the elements of either claim. TB-Elec alleges that SES "had a duty to present accurate terms to TB-Elec and to perform under the terms of the contracts." (Doc. 93 at 58.) TB-Elec then makes several conclusory statements that SES "acted with gross negligence and willful misconduct" by misrepresenting the cost of its services, failing to "meet with, notify, and involve" TB-Elec's attachers, failing to present the material terms it changed between the first and second PSA, and relying on Mr. Deville's purported knowledge of who TB-Elec's attachers were after failing to ask TB-Elec to identify its attachers. (Doc. 93 at 59.) TB-Elec does not provide any evidence to support these statements, nor does it specifically articulate how each of the elements of its claims are satisfied.

As previously discussed, TB-Elec has established that SES had a duty to hold an attacher meeting under the 2022 PSA, and that it breached that duty by not holding such a meeting. However, just as TB-Elec failed to sufficiently establish the causation element of its breach of contract claim regarding the attacher meeting, it

has failed to establish the causation element of its tort claim regarding the same. Even assuming SES had a duty to notify and involve the attachers separate from its duty to hold an attacher meeting, there is sufficient evidence for a jury to find in either party's favor on the question of whether SES breached that duty. Thus, this issue is for the trier of fact to decide.

In Alabama, "[w]antonness . . . requires 'the conscious doing of some act or the omission of some duty while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.'" *Tutor v. Sines*, 380 So. 3d 1035, 1038 (Ala. 2023) (quoting *Lands v. Ward*, 349 So. 3d 219, 229 (Ala. 2021)) (internal quotation marks omitted). Because TB-Elec has failed to establish that SES' alleged failure to notify or involve the attachers was either a conscious act or an omission of duty, TB-Elec has also failed to establish the elements of willful misconduct regarding these facts.

Additionally, TB-Elec has failed to establish that SES had a duty to disclose the differences between the unexecuted 2021 PSA and the 2022 PSA. The only caselaw TB-Elec cites in asserting that such a duty existed is a quotation establishing that a party to a contract may be liable to a third party for negligently performing under the contract. (Doc. 93 at 58) (quoting *Glasgow v. Jackson Land Surveying, LLC*, 236 So. 3d 111, 115 (Ala. Civ. App. 2017)). This quotation is irrelevant to the present case, as TB-Elec is not a third party to the contract between itself and SES.

TB-Elec offers no other factual or legal support for its assertion that SES had a duty to inform TB-Elec that the 2022 PSA differed from the 2021 PSA beyond simply providing the 2022 PSA for TB-Elec to review before signing. Therefore, TB-Elec has failed to sufficiently establish the duty element of its negligence claim regarding any alleged alterations to the terms of the PSA.

"Under Alabama law, a wantonness claim arising from the alleged omission of a duty fails as a matter of law when no such duty exists." *Gray v. L.B. Foster Co. Inc.*, 761 F. App'x 871, 875 (11th Cir. 2019) (citing *Dolgencorp, Inc. v. Taylor*, 28 So.3d 737, 746 (Ala. 2009)). Because TB-Elec has not established that SES owed a duty to disclose the alleged alterations to the terms of the PSA, it has failed to establish the first element of its negligence claim. As a result, it has also failed to establish its claim for willful misconduct on the same alleged set of facts.

TB-Elec also has not established that Mr. Deville's failure to ask for a list of attachers and reliance on his own knowledge of the attachers' identities amounts to gross negligence or willful misconduct. TB-Elec does not provide any evidence that SES had a duty to ask for a list of attachers earlier than it did, or at all. TB-Elec also does not cite any evidence that SES' reliance on Mr. Deville's prior knowledge of TB-Elec's attachers was a breach of duty or a conscious act done with the knowledge that an injury would likely result. TB-Elec has failed to establish that any of the

alleged action or inaction taken by SES satisfies all the elements of gross negligence or willful misconduct, and it is thus not entitled to summary judgment.

Although TB-Elec has failed to sufficiently establish the elements of its negligence and willful misconduct claims, SES has again failed to demonstrate that TB-Elec *cannot* establish those elements. SES argues it is entitled to summary judgment on the instant claims because "Louisiana law does not recognize gross negligence or willful neglect as a cause of action, unless a contract or special legislation provides otherwise" and Paragraph 8 of the PSA "does not serve as a basis for independent claims of gross negligence and willful misconduct against SES." (Doc. 91-1 at 52-53.) However, TB-Elec's tort claims are governed by Alabama law. Because SES has not met its burden to show that there are no genuine questions of material fact and that TB-Elec cannot establish the elements of gross negligence and willful misconduct under Alabama law, it is also not entitled to summary judgment on these claims.

Even if Louisiana law applied to TB-Elec's tort claims, SES' motion for summary judgment would still be due to be denied. SES is incorrect in asserting that Louisiana does not recognize claims of gross negligence or willful misconduct. "Louisiana courts have frequently addressed the concept of gross negligence." *Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 639 So. 2d 216, 219 (La. 1994). "Gross negligence has been defined," for example, "as the 'want of even

slight care and diligence' and the 'want of that diligence which even careless men are accustomed to exercise.'" *Id.* (quoting *State v. Vinzant*, 7 So.2d 917, 922 (La. 1942). "There is often no clear distinction between . . . [willful, wanton, or reckless] conduct and 'gross' negligence, and the two have tended to merge and take on the same meaning." *Ambrose,* 639 So. 2d at 220 (quoting *Falkowski v. Maurus*, 637 So.2d 522 (La. Ct. App. 1993)) (alterations in original). Because SES has failed to demonstrate—or even assert—that TB-Elec cannot establish the Louisiana elements of gross negligence and willful misconduct as a matter of law, it would not be entitled to summary judgment even if Louisiana tort law were applicable here.

Because the Court cannot determine at this stage of litigation whether SES engaged in any gross negligence or willful misconduct, it need not determine whether this alleged misconduct would "provide an exception to any liability on the part of TB-Elec pursuant to" the indemnity provision of the 2022 PSA. (Doc. 53 ¶ 60(e).) Accordingly, summary judgment in favor of TB-Elec on Counts V, VI, and Count III ¶ 60(e) is due to be **DENIED**. Summary judgment in favor of SES on the same counts is also due to be **DENIED**.

The Court also notes SES' argument that it is entitled to attorneys' fees and interest on its counterclaims and that TB-Elec is not entitled to attorneys' fees or punitive damages on its claims. (*See* doc. 91-1 at 31, 54, 55.) Because the Court has

denied both parties' motions for summary judgment on all counts, it need not make a determination regarding attorneys' fees, interest, or punitive damages at this time.

## IV. CONCLUSION

For the reasons discussed above, Plaintiff TB-Elec's Motion to Strike SES' Motion for Partial Summary Judgment is due to be denied. Defendant SES' Motion to Strike the Williams Affidavit and Charter Affidavit is due to be granted in part and denied in part. Defendant SES' Motion to Strike the Lightsey Declaration is due to be denied. Also for the reasons discussed above, Defendant SES' Motion for Partial Summary Judgment is due to be denied. Plaintiff TB-Elec's Motion for Summary Judgment is also due to be denied. The Court will enter an Order consistent with this Memorandum of Opinion.

**DONE** and **ORDERED** on September 25, 2024.

L. Scott Coogler
United States District Judge

220685